# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KENDALL REID and BRADLEY SEARS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 11 C 8683 |
| NEIGHBORHOOD ASSISTANCE | ) | |
| CORPORATION OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendant Neighborhood Assistance Corporation of America's ("NACA") Motion for Summary Judgment. (R. 44.) For the following reasons, the Court grants Defendant's Motion.

## BACKGROUND

### I.    Northern District of Illinois Local Rule 56.1

Under Northern District of Illinois Local Rule 56.1 ("Local Rule 56.1"), the moving party must file "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). The purpose of Local Rule 56.1 is to permit the parties to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (holding that a "statement of material facts did [ ] not comply with [Local] Rule 56.1 [because] it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"). District courts may rigorously enforce

compliance with Local Rule 56.1.  *See, e.g.*, *Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir.

2011) ("Because of the high volume of summary judgment motions and the benefits of clear

presentation of relevant evidence and law, we have repeatedly held that district judges are

entitled to insist on strict compliance with local rules designed to promote the clarity of summary

judgment filings.").  With these principles in mind, the Court turns to the relevant facts.

## II.    Relevant Facts

Plaintiffs Kendall Reid and Bradley Sears were "at-will" employees of NACA.  (Def.'s

56.1 Statements ¶ 20.) ("Def.'s 56.1").  NACA is a not-for-profit corporation that "counsel[s]

potential homeowners . . . to assist them in purchasing a home."  (Def.'s 56.1 ¶ 2.)  These

potential homeowners are also known as "members."  (*Id.*)  NACA's objectives are to "combat .

. . discriminatory and predatory lending practices" and to "make home ownership a realistic

possibility for thousands of people who had thought it impossible."  (Def.'s 56.1 ¶ 3.)  NACA

hired Reid and Sears as mortgage consultants in NACA's Chicago Office in October 2007 and

May 2010, respectively.  (*Id.* at ¶¶ 15,16.)  NACA's Chicago Office "consisted of an office

manager, several mortgage consultants, and two administrative assistants."  (*Id.* ¶ 18.)   From

early 2010 until the time of their terminations, Plaintiffs reported to Norma Martinez, the office

manager of the Chicago Office.  (*Id.* ¶ 18.)  Martinez reported to Donald Meadows, NACA's

Regional Operations Director for the region that included NACA's Chicago Office during 2010.

(Def.'s 56.1 ¶ 19.)  Meadows was physically based in Baton Rouge, Louisiana.  (*Id.*)

In April 2010, Norma Martinez placed posters on the walls of the Chicago Office

"indicat[ing] that the Illinois minimum wage was increasing to $8.25."  (Pls.' 56.1 Statement of

Additional Facts ¶ 17.) ("Pl.'s 56.1 SOF")  On or after July 1, 2010, at a Chicago Office staff

meeting, Reid asked Don Meadows whether NACA would pay the increased minimum wage. (Pls.' 56.1 SOF ¶ 18.) After July 1, 2010, Reid testified that he complained to NACA management or employees several times about the minimum wage increase. (*Id.* ¶ 18.) Specifically, Reid contends that he complained to Don Meadows that "[NACA] did not make the adjustments on our hourly wage." (*Id.* ¶ 19.) Sears made similar complaints to Meadows and Martinez. (*Id.* ¶¶ 27-28.)

Reid also complained about mortgage consultants not receiving proper overtime pay. Following the "big Chicago HomeSave" tour sometime after July 2010, Reid "raised the issue of the wages and overtime not being right for tours with Norma [Martinez] and in one conversation with Don Meadows." (*Id.* ¶ 21.) Specifically, Reid complained that "he and other mortgage consultants worked 13 hour days but were not paid for working 13 hours a day." (*Id.*)

Finally, Reid complained about NACA's practices regarding the processing and splitting of compensation for mortgage applications. As part of his work as a mortgage consultant, Reid signed Form 1003 Applications ("Form 1003"). (*Id.* ¶ 22.) According to Plaintiffs, on a Form 1003, a mortgage consultant at NACA represents that he or she "interviewed the client applying for the mortgage," "gathered the appropriate information to close the file," and "did not rely on the information of others." (*Id.*) During the time when NACA was implementing federal Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE Act") regulations, Reid and Meadows were the only two employees licensed in Illinois to sign Form 1003s. (*Id.* ¶¶ 13, 22.) Reid averred that Meadows signed off on loan applications and documents completed by other non-licensed mortgage consultants. (*Id.* ¶ 13.) According to Reid, he came to believe this practice was illegal in February or March of 2010 after speaking with Hazel McLamore, a U.S.

Department of Housing and Urban Affairs ("HUD") representative who was auditing NACA's files. (*Id.* ¶ 23.) Ms. McLamore "confirmed that NACA practices of having licensed mortgage consultants signing off on loan files worked on by unlicensed mortgage consultants was illegal." (*Id.*) Reid complained that this practice was illegal to Norma Martinez and Don Meadows. (*Id.* ¶ 24.) Reid also complained about NACA's practice of splitting commissions between licensed and unlicensed consultants to Don Meadows and at a staff meeting. (*Id.* ¶ 25.) Reid testified that he first complained about signing documents and splitting commissions around March, April, or May of 2010, and that he made his last complaint on this subject around late September of 2010. Sears made similar complaints to NACA management regarding NACA's practices pertaining to compensation splitting and requiring "mortgage consultants to affix their names to Form 1003 Applications." (*Id.* ¶¶ 29-32. )

On Friday, October 8, 2010, Reid left the NACA office at 6:30 p.m. to attend a Chicago Bulls basketball game. (*Id.* ¶ 20; Pls.' 56.1 Resp. ¶ 21.) According to Reid, Norma Martinez gave Reid permission to do so. (Pls.' 56.1 SOF ¶ 2.) On the morning of October 9, 2010, Martinez told Reid at the Chicago Office that "he was being suspended until further notice." (Def.'s 56.1 ¶ 22.) Plaintiffs contend that Martinez told Reid that "even though he worked the ten hour day on Friday[,] it was unfair for him to leave early when everyone else had to stay to 8:00 pm." (Pls.' 56.1 Resp. ¶ 22.)

On October 11, 2010, Rachelle Pride, NACA's National Real Estate Director, visited the Chicago Office. (Def.'s 56.1 ¶ 23.) On that day, the only Chicago employees present in the office were Sears, Martinez, and Mariola Jasinska, another mortgage consultant. (Def.'s 56.1 ¶ 25.) At her deposition, Pride testified that on October 11, she informed NACA's CEO, Bruce Marks, that on her visit she saw practices that "w[ere] out of NACA policy," including "financial

and sensitive documents for the NACA members that were visible . . . on top of desks in different places" and "alcoholic beverages in one of the offices."  (Def.'s 56.1 ¶ 27; Pride Dep. 24:22, 28:11, 25:20.)  Pride testified that she asked Marks for a directive, and he instructed her "to ask the two mortgage consultants for their office keys and to ask them to leave the office." (Pride Dep. 28:19-24.)  Pride then explained to Sears that he "had the documents" everywhere and that she "had been given a directive to ask him for his key and to ask him to leave the premises."  (Pride Dep. 32:17-24.)  On October 14, 2010, NACA decided to terminate both Sears and Reid.  (Def.'s 56.1 ¶¶ 45-46.)

On November 2, 2011, Plaintiffs filed suit in the Circuit Court of Cook County Illinois, alleging common law and statutory Illinois retaliatory discharge claims.  (R.1, Compl.) Plaintiffs alleged that NACA terminated them in retaliation for their complaints about NACA's alleged failure to pay minimum wage and overtime in violation of the Illinois Minimum Wage Law ("IMWL") and Illinois Wage Payment and Collection Act ("IWPCA"), as well as complaints about practices regarding compensation-splitting and signing mortgage applications allegedly prohibited by the Illinois Residential Mortgage License Act ("IRMLA") and the SAFE Act.  On December 7, 2011, Defendant removed this case to federal court on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.  (R. 1, Not. Removal.) Defendant moved for summary judgment on September 21, 2012.  (R. 44.)

## LEGAL STANDARD

Summary judgment under Rule 56(a) is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

5

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In deciding

summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving

party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380,

127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has the burden

of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v.

Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). After "a properly

supported motion for summary judgment is made, the adverse party 'must set forth specific facts

showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (quotation omitted).

"[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting

evidence or make credibility determinations, both of which are the province of the jury."

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011) (internal

citations omitted).

## ANALYSIS

Plaintiffs bring both Illinois common law and statutory whistleblower retaliatory

discharge claims. As the basis for their common law claims, Plaintiffs contend that they were

terminated because of their complaints regarding NACA's alleged violations of IMWL, IRMLA,

and SAFE. In addition, Plaintiffs seek statutory relief for their terminations resulting from their

complaints regarding NACA's alleged violations of the Illinois Wage Payment and Collection

Act (IWPCA), which provides a statutory retaliatory discharge cause of action.

In its Motion, Defendant argues that Plaintiffs' claims fail on two grounds. First,

Defendant contends that because Plaintiffs have failed to demonstrate that NACA's discharge of

them for their complaints would violate a clear mandate of public policy, as required for an

Illinois retaliatory discharge claim, Plaintiffs' claims are invalid. *See Turner v. Mem. Med. Ctr.*,

233 Ill. 2d 294, 502, 331 Ill. Dec. 548, 557, 911 N.E.2d 369, 375 (Ill. 2009). Second, Defendant

argues that even if Plaintiffs' terminations resulting from their complaints would violate Illinois

public policy, there are no genuine issues of material fact as to whether Plaintiffs' complaints

caused their terminations.

The Court will address each argument in turn.

I.      **"Clear Mandate of Public Policy" Requirement for Common Law Retaliatory Discharge Claims**

In order to determine whether Plaintiffs have satisfied this requirement, a review of the

relevant background principles governing Illinois common law retaliatory discharge claims is

necessary. To prove an Illinois retaliatory discharge claim, the plaintiff must show: "(1) the

employment was terminated by the employer, (2) the discharge was in retaliation for action of

the employee, and (3) the discharge violates a clear mandate of public policy." *Michael v.*

*Precision Alliance Grp., LLC*, 2011 IL App (5th) 100089, 952 N.E.2d 682, 687, 351 Ill. Dec.

890, 895 (Ill. App. Ct. 2011). This cause of action is a narrow exception to the Illinois rule that

at-will employees "generally may be discharged for any or no reason." *Id.*; *McGrath v. CCC*

*Info. Servs., Inc.*, 314 Ill. App. 3d 431, 438, 731 N.E.2d 384, 390 (Ill. App. Ct. 2000) (noting the

Illinois Supreme Court has "repeatedly and consistently emphasized a goal of restricting the tort

of retaliatory discharge."). "The limited scope of retaliatory discharge is an attempt to achieve a

'proper balance' between the employer's interest in maintaining an efficient and profitable

business while recognizing the competing interests of the employee in earning a livelihood and

society's interest in effectuating vital public policies." *Michael*, 952 N.E.2d at 686 (quoting

*Turner*, 233 Ill. 2d at 502).

Retaliatory discharge actions arise in two forms: "(1) a 'clear mandate' action, alleging that the complained-of conduct contravenes a clearly mandated public policy, but not necessarily a law; and (2) a 'citizen crime-fighter' theory." *Id.* at 687; *see Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 133, 52 Ill. Dec. 13, 421 N.E.2d 876, 880 (1981). Traditionally, "clear mandate" actions were based upon retaliation for the exercise of rights under the workers' compensation statute. *Sutherland v. Norfolk S. Ry. Co.*, 356 Ill. App. 3d 620, 624, 826 N.E.2d 1021, 1025 (Ill. App. Ct. 2005). The latter type of case "usually involve[s] an employee terminated for 'whistle-blowing' or telling of a coworker's commission of an alleged crime." *Michael*, 952 N.E.2d at 687.

Although Plaintiffs do not specifically style their retaliatory discharge claims as "whistleblower" claims, they base their claims on complaints regarding alleged violations of IMWL, IRMLA, and SAFE, rather than their exercise of any rights under these statutes. Plaintiffs' claims, therefore, fall under the "whistleblower" category of retaliatory discharge claims. *Russ v. Pension Consultants Co., Inc.*, 182 Ill. App. 3d 769, 775, 538 N.E.2d 693, 696 (Ill. App. Ct. 1989) ("The 'whistle-blowing' class of cases includes situations where an employee is dismissed for reporting that illegal or wrongful activities have been engaged in by a fellow employee or employer."); *see also King v. Senior Servs. Assocs., Inc.*, 341 Ill. App. 3d 264, 267, 792 N.E.2d 412, 415 (Ill. App. Ct. 2003) ("Retaliatory discharge actions have traditionally been allowed in two situations: (1) when an employee is discharged for seeking workers' compensation benefits; and (2) when an employee is discharged for reporting misconduct by the employer"); *Rabin v. Karlin & Fleisher, LLC*, 409 Ill. App. 3d 182, 186, 945 N.E.2d 681, 687 (Ill. App. Ct. 2011) (noting the same).

8

To state a claim for retaliatory discharge on a whistleblower theory, a plaintiff must allege the following: "(1) he or she was discharged; (2) in retaliation for the employee's activities; and (3) the discharge was in contravention of a clearly mandated public policy." *Mackie v. Vaughan Chapter-Paralyzed Veterans of Am., Inc.*, 354 Ill. App. 3d 731, 739-40, 820 N.E.2d 1042, 1049 (Ill. App. Ct. 2004). A "whistleblower" retaliatory discharge claim lies where "'an employee is discharged in retaliation for the reporting of illegal or improper conduct.'" *Lanning v. Morris Mobile Meals, Inc.*, 308 Ill. App. 3d 490, 491, 720 N.E.2d 1128, 1129 (Ill. App. Ct. 1999) (quoting *Jacobson v. Knepper & Moga, P.C.*, 185 Ill. 2d 372, 376, 235 Ill. Dec. 936, 706 N.E.2d 491, 493 (1998)). Retaliatory discharge also "protect[s] the reporting of the violation of regulations and statutes other than the Criminal Code." *Stebbings v. Univ. of Chicago*, 312 Ill. App. 3d 360, 372, 726 N.E.2d 1136, 1145 (Ill. App. Ct. 2000); *Mackie*, 354 Ill. App. 3d at 736.

With respect to the "clearly mandated public policy" prong, although "there is no precise definition" of public policy, "it can generally be said that public policy concerns what is right, just, and affects the citizenry of the State collectively." *McGrath*, 314 Ill. App. 3d at 440; *see also Belline v. K-Mart Corp.*, 940 F.2d 184, 187 (7th Cir. 1991) ("[A] matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." (quoting *Palmateer*, 52 Ill. Dec. at 15-16)). In *Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 133, 52 Ill. Dec. 13, 421 N.E.2d 876, 880 (1981), the Illinois Supreme Court emphasized that there "is no public policy more basic . . . than the enforcement of a State's criminal code." 85 Ill. 2d at 130, 132. Thus, while citizens do not possess a duty to investigate and fight crime, "[Illinois] public policy nevertheless favors citizen crime-fighters." *Id.* at 132.

9

In *Stebbings v. Univ. of Chicago*, 312 Ill. App. 3d 360 (Ill App. Ct. 2000),[1] the First District of the Appellate Court of Illinois distinguished the public policy prong in the context of a "citizen crime fighter" claim as a two-step analysis:

> First, there must be statutes, constitutional provisions, or judicial decisions that clearly mandate a public policy in favor of the reporting of crime. As it happens, in light of *Palmateer*, there is little question that such a policy has been clearly mandated and so this layer of law will rarely be at issue in a 'citizen crime fighter' suit. Second, there is the layer of law that allegedly prohibits the conduct that the employee reports or refuses to engage in. This layer of law must apply in that the employee must have a good-faith belief that it prohibits the conduct in question. It does not need to apply in the sense of providing a clearly mandated public policy.

312 Ill. App. 3d at 370-371.[2]

Before applying the *Stebbings* test to Plaintiffs' claims, the Court will address Defendant's contention that because Plaintiffs' complaints are compensation-related and thus purely "personal" in nature, they do not implicate the "health, safety or welfare of the citizens of Illinois." (Def.'s Mem. 14.) In *Benders v. Bellows & Bellows*, 515 F.3d 757, 767 (7th Cir. 2008), the Seventh Circuit rejected a similar argument, noting that the violation of a federal law governing the classification of workers as employees or independent contractors for tax purposes involved a matter of "public concern." *See* 515 F.3d at 767. Moreover, although some of Plaintiffs' complaints relate to compensation, because they are whistleblower claims, the relevant public policy at issue is that identified in *Palmateer* of encouraging citizens to report

---

[1] The parties do not cite the *Stebbings* "good faith" test in their briefs. The Seventh Circuit, however, has relied upon it in interpreting Illinois retaliatory discharge claims. *See Benders v. Bellows & Bellows*, 515 F.3d 757, 766 (7th Cir. 2008); *Brandon v. Anesthesia & Pain Mgm't Assocs.*, 277 F.3d 936, 941 (7th Cir. 2002). As persuasive authority on the interpretation of Illinois law, the Court will apply it here.

[2] Although *Stebbings* arose on a motion to dismiss, and thus determined good faith on the facts as alleged, Defendant has not filed a motion to dismiss in this case.

violations of crimes and other laws. *See* 85 Ill. 2d at 132. Thus, Defendant's argument fails.

Accordingly, the Court will consider whether Plaintiffs have satisfied the *Stebbings* formulation of the "public policy" prong for each of their common law retaliatory discharge claims.

### A.    Retaliatory Discharge Based Upon Complaints Regarding Alleged IMWL Violations

Under *Palmateer* and *Stebbings*, Plaintiffs have satisfied the "public policy" prong of their retaliatory discharge claims based upon NACA's alleged IMWL violations. First, as Plaintiffs' claims fall under the "citizen crime fighter" category, "there is little question that [a policy of reporting IMWL violations] has been clearly mandated." *Stebbings*, 312 Ill. App. 3d at 370-371. Second, Plaintiffs have satisfied the low hurdle of demonstrating a "good faith" belief that NACA's alleged conduct violated the IMWL. The IMWL provides that "on and after July 1, 2010 every employer shall pay to each of his or her employees who is 18 years of age or older in every occupation wages of not less than $8.25 per hour." ILCS 820 § 105/4. In his deposition, Reid testified that Norma Martinez posted "labor posters" in the office and break room indicating that the minimum wage would increase on July 1, 2010 to $8.25. (Reid Dep. 65:15-10.) Reid testified that he "recalled seeing" the posters and that "at the time we were getting $8 an hour." (Reid Dep. 65:19-20.) According to Reid, Andrell Thomas, another NACA employee, and "maybe one or two other people confirmed . . . that their payroll was not adjusted." (Reid Dep. 82:7-10.) Sears similarly claims that he complained to Norma Martinez and Don Meadows regarding NACA's failure to pay the new minimum wage rate. (Pls.' 56.1 SOF ¶ 27.) Thus, viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have satisfied the good-faith belief requirement with respect to their IMWL-based retaliatory

11

discharge claims.

### B.        Retaliatory Discharge Based Upon Alleged Violations of IRMLA

Similarly, Plaintiffs have demonstrated that their terminations for complaining about

NACA's alleged violations of IRMLA contravene a "clearly mandated" public policy.  First, as

with their IMWL-based claims, because Plaintiffs assert that Defendant terminated them for

complaining about their employer's alleged violations of law, "there is little question" that the

policy favoring reporting of such violations "has been clearly mandated."  *See Stebbings*, 312 Ill.

App. 3d at 370-71.  Second, viewing the evidence in the light most favorable to Plaintiffs,

Plaintiffs have shown a good faith belief that NACA's practices violated IRMLA.[3]  IRMLA

provides that "No person, partnership, association, corporation or other entity shall engage in the

business of brokering, funding, originating, servicing or purchasing of residential mortgage loans

without first obtaining a license from the Commissioner."  ILCS 205 § 635/1-3.  Plaintiffs

contend that NACA violated IRMLA and SAFE by "having licensed mortgage consultants sign[]

off on loan files worked on by unlicensed mortgage consultants."  (Pls.' 56.1 SOF ¶ 3.)  Reid

allegedly came to believe this practice was illegal after speaking with Hazel McLamore, a HUD

_____

[3] Although Defendant argues in its Rule 56.1 statements with respect to these allegations that NACA need not respond to legal conclusions, Plaintiffs need only demonstrate at this stage that they had a good faith belief that the conduct was illegal.  *See Brandon*, 277 F.3d at 941 ("The [Illinois retaliatory discharge] tort also does not require the employee to have been correct about the unlawfulness of the conduct, as long as she had a good-faith belief that it was unlawful."); *Bourbon v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000) ("The fact that Bourbon may have been wrong about whether the conduct was criminal is irrelevant under Illinois law. The Illinois Supreme Court explained that persons acting in good faith who have probable cause to believe crimes have been committed should not be deterred from reporting them by the fear of being wrongfully discharged." (internal citations omitted)).

employee who was auditing NACA's files. (Pls.' 56.1 SOF ¶ 23.)[4] Accordingly, viewing this evidence in the light most favorable to Plaintiffs, Plaintiffs have satisfied the "public policy" requirement for their whistleblower retaliatory discharge claims based upon complaints regarding alleged violations of IRMLA.

### C. Retaliatory Discharge Based Upon Alleged Violations of SAFE

The SAFE Act encourages the States "to establish a Nationwide Mortgage Licensing System and Registry for the residential mortgage industry." *See* 12 U.S.C. § 5101. It provides that subject to a mortgage licensing system, "an individual may not engage in the business of a loan originator without first--(1) obtaining, and maintaining annually--(A) a registration as a registered loan originator; or (B) a license and registration as a State-licensed loan originator." *See* 12 U.S.C. § 5103. Though Defendant argues in its brief that it is not clear that an alleged violation of a federal law may give rise to an Illinois retaliatory discharge whistleblower claim (Def.'s Reply 13 n.8), the Seventh Circuit has foreclosed this argument. *See Brandon*, 277 F.3d at 941 ("Notwithstanding the fact that Illinois has long had a public policy that encourages citizens to report crimes, the district court took the rather narrow view that these federal criminal statutes could not provide a basis for Illinois public policy." (internal citations omitted)).

Because Illinois enacted IRMLA to comply with the federal SAFE Act, *see* ILCS 205 § 635/1-2, the same analysis regarding Plaintiffs' IRMLA retaliatory discharge claims applies to Plaintiffs' retaliatory discharge claims premised upon violations of SAFE. Moreover, any differences in the legislation are insubstantial at this stage, as the *Stebbings* analysis does not

---

[4] Similarly, Sears' allegations of his complaints, which are substantially the same as Reid's, provide evidence of his good faith belief that NACA violated IRMLA, IMWL, and SAFE. (Pls.' SOF ¶¶ 27-32.)

"require the employee to have been correct about the unlawfulness of the conduct, as long as she had a good-faith belief that it was unlawful." *See Brandon*, 277 F.3d at 941. Thus, for the same reasons, Plaintiffs' SAFE-based retaliatory discharge claims satisfy the "public policy" requirement at this stage.

## II.   Illinois Statutory IWPCA Retaliatory Discharge Claim

In addition to common law retaliatory discharge claims, Plaintiffs raise a statutory retaliatory discharge claim premised upon complaints regarding alleged violations of the IWPCA.

The IWPCA defines wages as "including any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS 115/2. It does not, however, "establish a right to overtime pay or vacation pay, but rather allows for a cause of action based on compensation wrongfully withheld pursuant to 'an employment contract or agreement.'" *Hall v. Sterling Park Dist.*, 08 C 50116, 2011 WL 1748710, at *6 (N.D. Ill. May 4, 2011) (quoting 820 ILCS 115/1; *Palmer v. Great Dane Trailers*, 05 C 1410, 2005 WL 1528255, at *3 (N.D. Ill. June 28, 2005) ("The plain meaning of the IWPCA indicates that pay is only recoverable under the statute when the employer has breached contractual obligations."). As the Seventh Circuit has noted, Illinois courts have interpreted an "agreement" under the IWPCA to be "broader than a contract and require[] only a manifestation of mutual assent on the part of two or more persons . . . without the formalities and accompanying legal protections of a contract." *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012) (quoting *Zabinsky v. Gelber Grp., Inc.*, 347 Ill. App. 3d 243, 249, 807 N.E.2d 666, 671 (Ill. App.

Ct. 2004)).

Specifically, Plaintiffs seek relief under Section 14(c) of the IWPCA, which the Illinois

legislature amended in 2011 to include a cause of action for retaliation. (Compl. ¶ 15.) (R. 58,

Pls.' Mem. 14). Effective January 1, 2011, Section 14(c) provides the following:

> Any employer, or any agent of an employer, who discharges or in any other manner
> discriminates against any employee because that employee has made a complaint to his
> employer . . . that he or she has not been paid in accordance with the provisions of this
> Act . . . is guilty, upon conviction, of a Class C misdemeanor. An employee who has
> been unlawfully retaliated against shall be entitled to recover through a claim filed with
> the Department of Labor or in a civil action, but not both, all legal and equitable relief as
> may be appropriate. In a civil action, such employee shall also recover costs and all
> reasonable attorney's fees.

820 ILCS 115/14 (amended by P.A. 96-1407 (S.B. 3568)).

In their Response, Plaintiffs do not direct the Court to any cases interpreting the new

IWPCA retaliation provision. Nor did the Court's independent research reveal any such cases.

Ultimately, however, Plaintiffs' statutory IWPCA retaliatory discharge claims cannot survive

summary judgment because the record does not reflect any evidence that NACA failed to pay

Plaintiffs "in accordance with the provisions of [the IWPCA]." *See* 820 ILCS 115/14.

Specifically, case law interpreting claims to recover wages under the IWPCA makes clear that

the wages must have arisen from a contract or agreement. *See Hess*, 668 F.3d at 452 ("To

prevail on his IWPCA claim, Hess must first show that he had a valid contract or employment

agreement."); *Lopez v. Smurfit-Stone Container Corp.*, 02 C 7347, 2003 WL 297533, at *3 (N.D.

Ill. Feb. 10, 2003) (noting any entitlement to overtime wages arose from a collective bargaining

agreement and not the IWPCA).

In arguing that NACA terminated them because of their complaints about not receiving

proper overtime, (Pls.' Mem. 5), Plaintiffs have failed to direct the Court to any evidence

showing that such overtime pay was allegedly owed pursuant to a contract or agreement.

Although Reid stated in his deposition that he believed he had an "employment contract" with

NACA, he also subsequently acknowledged that he did not believe that either NACA's

"welcome letter" or personnel manual, which describe compensation, constituted an employment

contract. (Def.'s 56.1, Ex. 4, Reid Dep. 53:1-3.) Furthermore, Reid acknowledged in his

deposition that he signed the NACA personnel manual, which stated that the manual "did not

create a contract of employment" and that his "employment with NACA is on an at-will basis."

(Def.'s 56.1, Ex. 4, Reid Dep. 54: 16-22, Ex. 3); *see Skelton v. Am. Intercontinental Univ.*

*Online*, 382 F. Supp. 2d 1068, 1075 (N.D. Ill. 2005) (noting a similar disclaimer "[was] fatal to

plaintiffs' claim that the handbook was a 'contract' to pay overtime wages within the meaning of

the IWPCA"). Nor have Plaintiffs directed the Court to any evidence showing that the overtime

arose from a broader "agreement" or "manifestation of mutual assent." Accordingly, because

Plaintiffs have failed to present any evidence that the complaints related to overtime allegedly

owed to them pursuant to a contract or agreement, the Court dismisses Plaintiffs' retaliatory

discharge claims based upon a violation of the IWPCA.

## III.  Causation

Here, the parties dispute whether genuine issues of material fact exist as to whether

Plaintiffs' complaints regarding NACA's alleged violations of IMWL, IRMLA, and SAFE

caused NACA's termination of Plaintiffs. Defendant argues that Plaintiffs have failed to put

forth any evidence demonstrating that the sole decision maker, Bruce Marks, according to

Defendant, knew of Plaintiffs' complaints. Because after a "properly supported motion for

summary judgment is made, the adverse party 'must set forth specific facts showing that there is

a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (quotation omitted), Plaintiffs must

present evidence showing a genuine issue of fact exists as to causation.

In response, Plaintiffs contend that genuine issues of material fact exist as to (1) whether Bruce Marks was the sole decisionmaker in the terminations based upon NACA's inconsistent interrogatory answers regarding the individuals involved in the decision to terminate Plaintiffs; and (2) whether Don Meadows had retaliatory animus toward Plaintiffs based upon his alleged involvement in illegal practices about which Plaintiffs complained and whether such animus caused the termination decisions. (Pls.' Mem. 6-8.)

To establish causation in an Illinois retaliatory discharge claim, the plaintiff must prove that the employer discharged him "in retaliation for the employee's activities." *Mackie*, 354 Ill. App. 3d at 739-40. "[T]he ultimate issue to be decided is the employer's motive in discharging the employee." *Hartlein v. Ill. Power Co.*, 151 Ill. 2d 142, 163, 176 Ill. Dec. 22, 601 N.E.2d 720 (1992). Plaintiffs may establish causation through direct or circumstantial evidence. *Zuccolo v. Hannah Marine Corp.*, 387 Ill. App. 3d 561, 569, 900 N.E.2d 353, 360 (Ill. App. Ct. 2008) (citing *Hugo v. Tomaszewski*, 155 Ill. App. 3d 906, 910, 108 Ill. Dec. 562, 508 N.E.2d 1139 (Ill. App. Ct. 1987)); *Goode v. Am. Airlines, Inc.*, 741 F. Supp. 2d 877, 891 (N.D. Ill. 2010) (analyzing Illinois retaliatory discharge claim). Nonetheless, "it remains plaintiff's burden to prove the elements of the cause of action" in a retaliatory discharge case, including causation. *Clemons v. Mech. Devices Co.*, 184 Ill. 2d 328, 336, 704 N.E.2d 403, 406 (1998). Thus, "an employer is not required to come forward with an explanation for an employee's discharge." *Clemons*, 184 Ill. 2d at 336. "[I]f an employer chooses to come forward with a valid, nonpretextual basis for discharging its employees and the trier of fact believes it, the causation element required to be proven is not met." *Id.*; *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 301 (7th Cir. 2010) (applying *Clemons* approach on summary judgment); *Siekierka v. United Steel*

17

*Deck, Inc.*, 373 Ill. App. 3d 214, 222, 868 N.E.2d 374, 380 (Ill. App. Ct. 2007).

In *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 301 (7th Cir. 2010), the Seventh Circuit held that in deciding motions for summary judgment on Illinois retaliatory discharge claims, the *Erie* doctrine requires federal courts to follow Illinois law rather than the federal *McDonnell Douglas* burden-shifting approach in determining whether a plaintiff has met his burden on causation. *See* 614 F.3d at 303. In explaining the difference between the rules, the Seventh Circuit noted that in a case governed by *McDonnell Douglas*, "if the employer fails to offer any reason for having fired the plaintiff," "[a]n inference would arise that the reason was the unlawful one alleged by the plaintiff" and "the plaintiff would win under *McDonnell Douglas* without more." *Gacek*, 614 F.3d at 301. On the other hand, under the Illinois rule, "which requires proof of causation," the plaintiff, as in a traditional tort claim, "would have to prove that the alleged discrimination was the cause of his being fired." *Id.* Accordingly, a plaintiff may not survive summary judgment merely by "proving that the reasons given . . . for firing him were unworthy of belief." *Id.* at 303; *Robinson v. Stanley*, 06 C 5158, 2011 WL 3876903, at *6 (N.D. Ill. Aug. 31, 2011) *aff'd*, 474 F. App'x 456 (7th Cir. 2012).

### A.    NACA's Interrogatory Answers Regarding Individuals Involved in Terminations

In NACA's February 17, 2012 interrogatory answers, NACA listed Don Meadows, Rachelle Pride, and Christine Cannonier in response to a question regarding the individuals involved in the decision to terminate Plaintiffs. (Pls.' 56.1 SOF ¶ 35.) In its July 17, 2012 amended response to Plaintiffs' interrogatories, NACA added the name of Bruce Marks to this list. Later, Marks testified in his deposition that it was solely his decision to terminate Plaintiffs and that he did not know of their complaints when he decided to terminate them. (Def.'s 56.1,

Ex. 3, Marks Dep. Tr. 36:5:11.)  Marks also acknowledged that he received input on the decision from Rachelle Pride, Don Meadows, Christine Cannonier, NACA's National Human Resources Director, and James Kimmons, a NACA employee who worked in the Milwaukee, Wisconsin Office, and that he had a conversation with Meadows regarding Sears and Reid prior to their terminations.  (Def.'s 56.1 ¶ 42.)

Plaintiffs argue that the inconsistent interrogatory answers constitute evidentiary admissions and create a genuine issue of material fact as to who terminated Plaintiffs' employment.  (Pls.' Mem. 6.)  Interrogatory answers may constitute evidence that precludes summary judgment.  *See Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 679 (7th Cir. 2003).  In a retaliatory discharge case based on an employee's complaints, evidence that those responsible for the employee's termination knew of his complaints is "essential."  *See Hunt v. DaVita, Inc.*, 680 F.3d 775, 779 (7th Cir. 2012) ("[L]ogic dictates that any inference of retaliatory intent must be based on the alleged retaliator's knowledge of the action allegedly retaliated for.")  Plaintiffs' argument, however, fails to acknowledge that while it may be necessary for Plaintiffs to show that the decisionmakers had knowledge of their complaints to establish a prima facie case, such a showing may not be sufficient to establish a question of fact as to whether those complaints were the cause of Plaintiffs' terminations under the heightened Illinois standard.  *See Goode*, 741 F. Supp. 2d at 891 ("If . . . the plaintiff relies on circumstantial evidence, at a minimum he must show that the decision-makers involved in his termination knew that he was filing a workers' compensation claim, seeking medical treatment, or otherwise asserting a right under the IWCA.")  Thus, even viewing the facts in the light most favorable to Plaintiffs, the Court must address whether Plaintiffs have offered further evidence of causation.

### B.     "Cat's Paw" Theory

Plaintiffs argue that even assuming that Marks was the "ultimate decision maker," causation is satisfied under a "cat's paw" theory, by which NACA would be liable for the terminations notwithstanding Marks' lack of knowledge of Plaintiffs' complaints because "Meadows, while acting within the scope of his employment caused Marks to terminate Reid and Sears by lying to Marks."  (Pls.' Mem. 8.)  Specifically, Plaintiffs assert that "Meadows had an interest" in the termination of Plaintiffs because Meadows had "significant personal exposure as a result of him personally violating . . . federal and state law" and because the "termination of [the Plaintiffs] would silence . . . complaints and lessen Don Meadows' risk and exposure arising from the federal and state law violations."  (Pls.' 56.1 SOF ¶ 15; Reid Decl. ¶¶ 26-28.)  In support of their theory, Plaintiffs point to Reid's testimony regarding his own concerns about the legality and consequences of NACA's practices.  *See* Pls.' SOF ¶ 25.   This speculation is insufficient to create a genuine issue of material fact as to whether Meadows had any retaliatory animus based upon Plaintiffs' complaints or whether any such animus caused their terminations. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) ("It is well settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact.").  Plaintiffs further point to a conversation between Marks and Meadows, in which Meadows told Marks that Plaintiffs had been warned about the document security policy by James Kimmons on one of Kimmons' visits to the Chicago Office.  Plaintiffs contend that a genuine issue of fact exists as to whether Kimmons discussed the document security policy with the employees and Reid specifically on that visit, (Pls.' Mem. 8), and that any such discrepancy supports an inference both that Meadows lied to Marks and that Meadows had retaliatory animus toward Plaintiffs.  (Pls.' Mem. 8.)

Even viewing the inferences in the light most favorable to Plaintiffs, Plaintiffs' "cat's paw" theory fails. As an initial matter, Plaintiffs fail to cite to any cases applying the "cat's paw" theory in the context of Illinois retaliatory discharge claims. Plaintiffs also fail to provide any evidence connecting Meadows' rather vague statement to Marks–that Plaintiffs had been "warned" about the "paperless policy" and that "yeah James [Kimmons] was [at the Chicago Office] previously and we just had this conversation within a two-week period"– to any retaliatory motive to terminate Plaintiffs because of Meadows' own alleged participation in illegal practices. (Pls.' Resp., Meadows Dep. 106.) Nor does the record show any evidence demonstrating that any other individuals potentially involved in Plaintiffs' terminations had retaliatory animus toward Plaintiffs. Thus, Plaintiffs' cat's paw theory is unavailing.

### C.      Timing

Furthermore, the timing of the terminations does not support an inference that Plaintiffs' complaints caused their terminations. *Davis v. Times Mirror Magazines, Inc.*, 297 Ill. App. 3d 488, 496, 697 N.E.2d 380, 387 (Ill. App. Ct. 1998) ("[T]he timing of the termination, by itself, is not enough to show retaliatory discharge."); *Zuccolo*, 387 Ill. App. 3d at 569 (noting in denying summary judgment not only the "short span of time" between the plaintiff's complaints to his employer and his termination, but his intended refusal to pilot a certain vessel and complaints to the Coast Guard); *see also Teruggi v. CIT Group/Capital Fin., Inc.*, 12-2314, 2013 WL 628324, at *6 (7th Cir. Feb. 21, 2013) ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link." (quoting *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004))). Although Plaintiffs argue that Plaintiffs complained as recently as several weeks and days, respectively, before their terminations, (*see* Pls.' SOF ¶

21

26, 32; Lazu Dep. 56), the record demonstrates that most of the complaints regarding minimum

wage and overtime came in June and July of 2010, and those concerning NACA's practices with

respect to splitting commissions and signing Form 1003s from March until June of 2010–months

before NACA's decision to terminate Plaintiffs in October 2010. *See* Pls.' SOF ¶¶ 17-21, 24, 25,

30. Moreover, both Reid and Diane Lazu, a NACA employee who testified to Plaintiffs'

complaints, describe the complaints as an "ongoing" concern, which further undermines the

significance of the short period of time between the last set of complaints and Plaintiffs'

terminations. (Pls.' 56.1 Resp., Lazu Dep. 40, 43, 49; Reid Dep. 245.); *see Goode*, 741 F. Supp.

2d at 893 (noting "suspicious timing" where firing occurred a month from injury for which

employee sought worker's compensation and employer began investigating employees's

activities within a day of injury). In sum, the timing of Plaintiffs' terminations alone does not

support an inference that Plaintiffs' complaints caused them.[5]

---

[5] Plaintiffs also raise various arguments as to why NACA's reasons for termination are pretextual. (Pls.' Mem. 10.) The Seventh Circuit has made clear, however, that under the stricter Illinois causation standard, a plaintiff may not prevail "merely by proving that the reasons given by the [employer] for firing [the employee] were unworthy of belief." *Gacek*, 614 F.3d at 303. Even if the Court were to consider pretext, Plaintiffs' arguments fail because they have not demonstrated that NACA "did not honestly believe the reasons it gave for its action and is simply lying to cover [its] tracks." *McCoy v. Maytag Corp.*, 495 F.3d 515, 522 (7th Cir. 2007) (internal quotation marks omitted). NACA has provided several reasons for Plaintiffs' terminations, including for Reid that he "had alcohol in his office" and that he had "certain attendance issues, specifically his leaving work early on October 8." (Def.'s 56.1 ¶ 45.) Plaintiffs do not dispute that Reid left work early on October 8 at 6:30 p.m. to attend a Chicago Bulls basketball game and that he had alcohol in his office, but only whether Norma Martinez authorized Reid to do so and whether such alcohol was for display purposes only. (Def.'s 56.1 ¶ 21; Pls.' 56.1 Resp. ¶¶ 21, 28, 45.) Similarly, Defendant contends that NACA terminated Sears because Sears had violated NACA's "paperless" policy and because Marks believed that "Sears' services to the clients w[ere] poor." (Def.'s 56.1 ¶ 46.) Plaintiffs admit that NACA had a written policy entitled "NACA Office Document Security Policy," which provided that "under [no] circumstances should a member's personal information be left exposed in your work area" (Pls.' 56.1 Resp. ¶ 5; Pls.' 56.1 SOF ¶ 11; Def.'s 56.1, Ex. 4, Reid Dep., Ex. 13.), and that Sears "print[ed] off members' documents in anticipation of a meeting with management." (Pls.' Resp.

Viewing the facts in the light most favorable to Plaintiffs, Plaintiffs have not shown a genuine issue of material fact as to whether Plaintiffs' complaints were the cause of their terminations under the more rigorous Illinois rule. *See Gacek*, 614 F.3d at 303 (noting the *McDonnell Douglas* and Illinois rules are "materially different"). In light of the gap in time between the majority of the complaints and the terminations and the lack of evidence supporting Plaintiffs' retaliatory animus "cat's paw" theory, Plaintiffs at best raise only a "metaphysical doubt" rather than a genuine issue of material fact as to the cause of their terminations. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Defendant, therefore, is entitled to summary judgment on Plaintiffs' claims.

---

56.1 ¶¶ 31, 32.) Moreover, while Plaintiffs argue that NACA did not terminate every mortgage consultant who allegedly violated the "paperless" policy, NACA did terminate Mariola Jasinska–the only other mortgage consultant besides Sears present in the office on the day of Pride's visit to the Chicago Office–when she observed conduct that was "outside" the NACA policy. (*See* Pls.' 56.1 Resp. ¶¶ 24, 49.) Ultimately, these discrepancies show a difference in interpretation between Plaintiffs and NACA over NACA's policies rather than a dispute as to whether decisionmakers at NACA honestly believed that they were applying those policies at the time. *See Teruggi*, 2013 WL 628324, at *5 ("An unwise employment decision does not automatically rise to the level of pretext; rather, a party establishes pretext with evidence that the employer's stated reason or the employment decision was a lie—not just an error, oddity, or oversight." (internal quotation marks omitted)); *Goode*, 741 F. Supp. at 894.

**CONCLUSION**

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment.

**Date: March 14, 2013**

**ENTERED**

**AMY J. STUEVE**
**United States District Court Judge**